**FEDERAL LEASING, INC., Plaintiff,**

v.

**UNDERWRITERS AT LLOYD'S et al., Defendants.**

**UNDERWRITERS AT LLOYD'S et al., Counter-Plaintiffs,**

v.

**FEDERAL LEASING, INC., Counter-Defendant.**

**UNDERWRITERS AT LLOYD'S et al., Counter-Plaintiffs (Complaint for Interpleader),**

v.

**FEDERAL LEASING, INC., Counter-Defendant,**

**and**

**The Bank of California, N.A., et al., Other Counter-Defendants.**

Civ. No. H–79–1088.

United States District Court, D. Maryland.

April 17, 1980.

John Doar, New York City, and Benjamin Rosenberg, G. Stewart Webb, Jr. and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

John E. Sandbower, III, Robert J. Carson, Phillips P. O'Shaughnessy and Smith, Somerville & Case, Baltimore, Md., for defendants.

Michael Sandler and Steptoe & Johnson, Washington, D. C., and Joshua R. Treem, and Weinberg & Green, Baltimore, Md., for counter-defendant Suburban Trust Company.

James E. Nesland and Ireland, Stapleton & Pryer, Denver, Colo., and Jervis, Spencer, Finney and Ober, Grimes & Shriver, Baltimore, Md., for intervenors Kirchner, Moore & Co. and Allstate Insurance Co.

ALEXANDER HARVEY, II, District Judge:

In this civil action, an assured is seeking damages and other relief from an insurer because of the failure of the latter to pay large claims allegedly due under various indemnity insurance policies. The plaintiff, Federal Leasing, Inc. (hereinafter "Federal Leasing") is here claiming compensatory and punitive damages for breach of "master declaration computer equipment lease indemnity policies," which were issued by defendants.

Federal Leasing, a Maryland corporation organized in 1974, is engaged in the business of leasing and selling computer equipment to commercial and governmental users. Named as defendants in the complaint are certain Underwriters at Lloyd's and certain other British insurance companies (hereinafter collectively referred to as "Underwriters" or "the defendants"), which sold the policies to Federal Leasing. Presently before this Court are: (1) a motion for a preliminary injunction filed by Federal Leasing; (2) a motion for a preliminary injunction filed by Suburban Trust Company (hereinafter "Suburban"),[1] (3) a motion for a preliminary injunction filed by Kirchner, Moore & Company and Allstate Insurance Company (hereinafter "Kirchner" and "Allstate");[2] and (4) a motion for a preliminary injunction filed by Underwriters. Extensive briefs have been filed in support of and in opposition to the pending motions, and oral argument has been heard in open court. This Court has also reviewed the voluminous affidavits, exhibits and deposition excerpts submitted by the parties in support of their respective positions.

I

*The Pleadings*

Federal Leasing instituted this suit on June 12, 1979, naming as defendants Underwriters at Lloyd's and seventeen British insurance companies. Federal Leasing's complaint is 168 pages in length and contains 26 Counts in 407 separate paragraphs. In Counts Nos. 1 to 23, plaintiff seeks payment from Underwriters of some $23 million allegedly owed under various different cover notes insuring financial obligations incurred by plaintiff resulting from the early termination of computer leases and conditional sales agreements by users of the equipment. Count No. 24 seeks a declaratory judgment establishing Underwriters' liability for plaintiff's financial obligations in connection with the early termination of any computer leases or conditional sales agreements which might occur in the future. Plaintiff seeks for itself $50 million in consequential damages in Count No. 25 and $50 million in compensatory damages and $500 million in punitive damages in Count No. 26.

In their answer, Underwriters have raised twenty-one separate defenses. Underwriters have also asserted a two-Count counterclaim against plaintiff. The first Count seeks rescission of the cover notes on the ground that they were obtained by misrepresentation. The second Count seeks re-

---

1. Suburban was named as a counterdefendant in the second amended complaint for interpleader filed by defendants. Other counterdefendants have been dismissed from this action, but Suburban has chosen to remain as a party and has asserted claims of its own against both Federal Leasing and Underwriters.

2. Kirchner and Allstate have intervened in this action and have asserted claims of their own against both Federal Leasing and Underwriters.

covery of $10 million which Underwriters allegedly had overpaid on claims asserted by plaintiff.

Underwriters also filed a complaint for interpleader in which they named Federal Leasing and numerous third-party investors as defendants.[3] On September 11, 1979, this Court entered an Order restraining the defendants named in the amended complaints for interpleader from instituting or prosecuting in any other court any suit or proceeding against Underwriters arising out of the matters involved in this action. Several investors promptly moved to dissolve the preliminary injunction. Following a hearing, this Court, on November 5, 1979, rendered an oral opinion, ruling that the injunction previously entered should be dissolved. This Court held that since Federal Leasing and the investors were not adverse claimants, interpleader was not appropriate either under the Interpleader Statute, 28 U.S.C. § 1335, or under Rule 22, F.R.Civ.P.

Subsequently, fourteen of the seventeen investors named as counterdefendants moved to dismiss the second amended complaint for interpleader as to them. These motions were granted by the Court and all but three of these counterdefendants were dismissed from this suit.[4] In addition, this Court granted leave to intervene as parties plaintiff to The Bank of California, N.A.; Kirchner, Moore & Company; Allstate Insurance Co.; Chemical Bank; and Chemlease Worldwide, Inc. These parties have asserted claims against both Federal Leasing and Underwriters arising as a result of the termination of the computer leases and conditional sales agreements involving them.

In the pending motions, Federal Leasing, Suburban, Kirchner and Allstate seek a preliminary injunction which would require Underwriters to advance to the moving parties during the pendency of this action the sums allegedly owing under the master insurance policies.[5] In their motion for a preliminary injunction, Underwriters seek an Order prohibiting Federal Leasing from commencing or prosecuting in any federal court any suit or claim against Underwriters based upon the indemnity insurance policies in question.

## II

### The Court's Findings of Fact

■ In granting or denying a motion for a preliminary injunction, a court must set forth its findings of fact which constitute the grounds of its action. Rule 52(a), F.R. Civ.P. Unlike findings made as a part of a ruling on a motion for summary judgment filed under Rule 56, a court may resolve conflicting inferences of fact in ruling on a motion for a preliminary injunction filed under Rule 65. *See* 11 Wright and Miller, *Federal Practice and Procedure*, § 2949 at pp. 480–82 (1973).[6]

■ Initially, the question is raised in this case whether a motion for a preliminary injunction may be granted or denied without an evidentiary hearing, particularly in a case such as the pending one where some facts in the affidavits are conflicting. *See S.E.C. v. Frank*, 388 F.2d 486 (2d Cir. 1968). It has been held, however, that once a party joins "the battle of the affidavits," he has consented to a decision based on them and cannot complain about the result if he is the loser. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970). In *Blackwelder Furniture Company*

---

3. Several amended complaints for interpleader were subsequently filed by Underwriters, the last being designated "Second Amended Complaint on Counterclaim for Interpleader."

4. The remaining counterdefendants are Suburban, Fedleasco and First National Bank of Northeast.

5. Federal Leasing seeks some $23,000,000; Suburban some $1,860,000, and Kirchner and Allstate some $2,000,000. These claims overlap. Included in Federal Leasing's claim are amounts owed Suburban, Kirchner and Allstate.

6. Professors Wright and Miller further suggest that such conflict should be resolved by an evidentiary hearing. As discussed later, in a case such as this one in which the parties have joined the "battle of the affidavits," an evidentiary hearing is unnecessary.

*v. Seilig Manufacturing Company, Inc.*, 550 F.2d 189 (4th Cir. 1977), the Fourth Circuit specifically approved the making of findings of disputed facts on a record such as this one where the parties have "willingly joined in the battle of affidavits." 550 F.2d at 192, n.1. This principle has been reaffirmed in other recent cases in this and other courts. *Dopp v. Franklin National Bank*, 461 F.2d 873 (2d Cir. 1972); *Scott & Fetzer Co. v. McCarty*, 450 F.Supp. 274, 277 n.3 (N.D.Ohio 1977); *Phillips v. Crown Central Petroleum Corp.*, 376 F.Supp. 1250, 1253 (D.Md.1973).

In this case, none of the parties requested an evidentiary hearing. Instead, all the parties vigorously joined in the battle of the affidavits, exhibits and depositions. Plaintiff's motion for preliminary injunction was filed on September 20, 1979, and up until the date of the hearing on the motion on March 14, 1980, the parties engaged in extensive discovery. A voluminous record has been furnished to the Court, including affidavits, exhibits and excerpts from depositions. Indeed, the record before the Court is in many ways more complete than many other cases in which the Court has held an evidentiary hearing on a motion for a preliminary injunction.

Although the record here discloses that there are some disputes of fact, many of these are not material to the issues presented at this time. Where essential facts or inferences from the facts are disputed, the record here is sufficiently complete for the Court to resolve the disputes, particularly since the parties have joined in presenting the issues to the Court in the manner they did.[7] Merely because these motions for a preliminary injunction have been heard on a record consisting of affidavits, exhibits and depositions, the Court is not foreclosed from evaluating the sworn statements in light of the overall record. *See Bowers v.*

*Columbia General Corp.*, 336 F.Supp. 609, 613 (D.Del.1971).

### III

#### The Facts [8]

The business of Federal Leasing consists of marketing computer equipment to both commercial and governmental users. A typical commercial transaction involved the execution of a lease between Federal Leasing as the lessor and the commercial user as the lessee. A typical governmental transaction involved the execution of a conditional sales agreement between Federal Leasing as the conditional vendor and the government user as the conditional vendee. Both types of agreement contained provisions which allowed the user, after a certain period of time [9] and upon 180 days' written notice, to terminate the agreement in its sole discretion without penalty. The standard conditional sales agreement also permitted early termination by a governmental user for non-appropriation of the necessary funds by the legislature or other similar body.

So that it might purchase from a manufacturer the computer equipment to be sold to a user, Federal Leasing would incur financial obligations to a third party, either by borrowing or by a similar contractual arrangement. These lending institutions, which the parties have referred to as "investors," included banks, finance companies and insurance companies throughout the United States. It is these banks and other financial institutions which now have claims against Federal Leasing amounting to the $23 million which the latter is seeking from Underwriters.

In a typical commercial transaction involving a lease, Federal Leasing would retain title to the computer equipment. Fed-

---

7. Moreover, both the plaintiff Federal Leasing and the defendants Underwriters have filed separate motions for a preliminary injunction. Each party is therefore asking this Court to make findings on this record which support its position, even though there are disputed facts.

8. Findings of fact and conclusions of law under Rule 52(a) are embodied in this written opinion, whether or not expressly so characterized.

9. Normally, neither a conditional sales agreement nor a lease could be terminated until the expiration of three years after its effective date.

eral Leasing would give to the investor a promissory note secured by a security interest in the equipment. Federal Leasing would also assign to the investor part or all of the monthly rental payments to cover the amounts due on the promissory note. If the lessee terminated the lease, as it had a right to do after a fixed period of time, Federal Leasing's obligation to the investor under the promissory note would become due and payable. Any loss to Federal Leasing would be reduced or eliminated if the computer equipment could be remarketed.

In a typical governmental transaction involving the execution of a conditional sales agreement, Federal Leasing would assign all its rights under the conditional sales agreement, including its security interest in the equipment, to the investor in return for the payment of an amount equal to the present value of the income stream generated by the conditional sales agreement. Federal Leasing's profit was the difference between the amount received from the investor and the amount paid to the manufacturer for the equipment. The investor gained an additional advantage as a result of the assignments because under applicable provisions of the Internal Revenue Code, interest payments made by governmental purchasers were tax exempt.

There were a number of different factors which an investor had to weigh in order to decide whether or not it should finance a particular transaction. The primary factors to be considered included the user's creditworthiness, the type of computer equipment involved, the length of the lease or conditional sales agreement, and Federal Leasing's ability to remarket the equipment. Under normal market conditions, early termination by the user would not be considered to be a substantial risk by an investor for two reasons: (1) because in transactions involving conditional sales agreements, the user would have built up equity in the equipment which would be lost in the event of early termination;[10] and (2) be-

cause under normal market conditions, the equipment could always be remarketed for a price which would avoid any loss by Federal Leasing or the investor. The principal risk faced by an investor involved a drastic change in market conditions. If market conditions changed so that the computer equipment could not be remarketed at a price substantially similar to the original price, then an investor would risk a loss caused by the early termination. Under such circumstances, the collateral held by the investor as security would not be sufficient to cover the full amount of the indebtedness. Furthermore, if there were many simultaneous terminations, Federal Leasing's financial position would not permit it to meet its obligations for all the transactions which might be affected. Because of this risk, many investors initially hesitated to enter into agreements of this sort with Federal Leasing.

Faced with this problem, Federal Leasing sought means whereby it might lessen the investor's risk and make transactions of this sort more attractive. In 1974, Federal Leasing requested Baker, Watts & Co., a Baltimore investment firm, to ascertain whether Lloyd's of London might be interested in insuring this risk. After investigating the matter, Baker, Watts & Co. reported that Lloyd's was indeed interested in issuing an indemnity policy which would cover a risk of this sort and that one such policy in fact already existed. Peter Nottage, the manager of Adams Brothers, Ltd., a wholesale brokerage firm for Lloyd's of London, devised the language of that policy and acted as broker for all other assureds seeking issuance of the same policy. Federal Leasing thereupon applied for a policy of this sort through Nottage and the first "Master Policy" was later issued to Federal Leasing for the period running from September 1, 1974 to August 31, 1975.

The 1974 indemnity policy was issued by fifty-five underwriting syndicates at Lloyd's (the so-called "Underwriters at

---

**10.** During the three-year period when termination was not permitted, the user would have been making payments of principal as well as of interest. If the agreement were terminated after the three-year period, the principal payments would be forfeited.

Lloyd's") and by seventeen British insurance companies, all of which agreed to accept a portion of the risk of the Federal Leasing Master Policy, and all of which have been named as defendants in this case. The lead underwriting syndicate for this policy and for all other similar policies was a syndicate known as "E. F. Williams and Others." The underwriter for this syndicate and the lead underwriter for all the syndicates and insurance companies involved was E. C. Street-Porter. As lead underwriter, Street-Porter acted as agent for all other underwriters in accepting policies and in handling claims.

Nottage had approached Street-Porter in early 1974 to determine whether his syndicate would be willing to subscribe to a portion of the risk of the computer lease indemnity policies and to act as lead syndicate. It was made clear to Street-Porter that the insurance policies were to indemnify the computer leasing company for loss in the event that a user exercised its right of early termination and the loss could not be covered by a remarketing of the equipment.

In evaluating this risk, Street-Porter considered the possibilities of (1) a drastic decrease in the price of computer equipment accompanied by (2) a considerable technological improvement in the product. Historically, inflation and other factors had caused the price of computer equipment to continue to increase over the years. Although there had been continuing technological advancement in the industry, the greater the improvement, the greater the price increase. A user which might consider terminating an agreement with Federal Leasing would be deterred both by the increased price it would have to pay for replacement equipment and by the resulting loss of equity in the equipment it was then using. Only if there was a considerable technological advance accompanied at the same time by a drastic decrease in price might a user be tempted to terminate. Historically, this had never occurred in the industry. Following a study of the matter, Street-Porter concluded that the risk that both of these events would occur at the same time was minimal. He therefore

agreed that his syndicate would subscribe to a portion of the insurance, and he further agreed that it would act as the lead syndicate.

After the first Master Policy was issued in 1974, Federal Leasing obtained coverage for a particular transaction by submitting a declaration to All Risks, Ltd., Federal Leasing's American retail insurance broker. All Risks would forward the declaration to Anthony Gibbs, Sage Ltd., Lloyd's London retail broker, which in turn would forward it to Adams Brothers, Lloyd's wholesale broker. Adams Brothers then would present the declaration to Paul Williams, the deputy lead underwriter, who was empowered to either accept or reject the declaration. If the declaration was accepted, notification was passed back down the chain of command to All Risks, which would then issue a cover note for that particular transaction. The cover note constituted the insurance policy for that particular transaction and the investor was then usually named as loss payee or co-assured.

By April 1975, Federal Leasing had obtained cover notes for seven different transactions. At that point, representatives of Federal Leasing met with Nottage to review the documents involved in transactions with governmental users. At that meeting, Nottage questioned whether Federal Leasing would be covered on termination of a conditional sale agreement since Federal Leasing had not assumed any direct obligation to the investor when it assigned the conditional sales agreement to the investor. To remedy this problem, Nottage and attorneys for Federal Leasing developed a standard remarketing agreement to be entered into by Federal Leasing and the investor. This agreement provided that for sixty days after termination of a conditional sales agreement, Federal Leasing would attempt to sell or lease the equipment on behalf of the investor by way of a new transaction which would return to the investor the full amount then owed under the conditional sales agreement or an income stream with a present value on an after-tax basis equal to that amount. If no such

remarketing had been accomplished within sixty days following the date of termination, Federal Leasing agreed to repurchase the equipment for the amount still owed under the terminated agreement. Both Federal Leasing and the investor, as co-assured or loss payee, would then have full recourse to the proceeds of the insurance policy issued by Underwriters. These arrangements, which were acceptable to Nottage as well as Federal Leasing, proved to be quite successful for all concerned, and between 1974 and 1978 Federal Leasing declared under its Master Policies approximately $130 million in transactions.

Although there were some terminations and resulting claims under the policies in the early years, they were relatively few. Prior to March 1977, only thirteen early terminations had occurred. Of these terminations, seven resulted in claims against Underwriters, and were duly paid by Underwriters. Substantial premiums were collected by Underwriters for the risks insured.[11]

From the very outset, indemnity insurance covering losses of this sort proved extremely popular in the industry. In fact, the early growth was so rapid that the insurers became concerned as to their exposure. In September 1974, shortly after Federal Leasing obtained its first Master Policy, the lead underwriter decided to suspend the acceptance of new business of this sort from other computer leasing companies. The reason for the suspension was that the insurers had, even by that early date, exposed themselves to extremely large potential liability in a new class of business as to which no underwriting experience had as yet been gained. Underwriters thereupon undertook a thorough and extensive review of the relevant underwriting criteria. Meanwhile, Underwriters continued to accept business from old customers like Fed-

eral Leasing, and Federal Leasing was even issued a second Master Policy covering the period from September 1, 1975 to August 31, 1976.

In August 1976, the insurers' review was completed, and Underwriters reopened the market to new customers on a revised basis. The revised policies placed responsibility for the evaluation of the business aspects of a transaction upon the respective vendor such as Federal Leasing, and the respective investor. The revised policies required prospective assureds to submit detailed information about their financial status and business practices. Underwriters also required that they be furnished detailed information concerning the user and the particular equipment involved. A substantial co-insurance requirement was likewise included in order to place more of the financial risk upon the parties to the transaction.

Federal Leasing objected to the issuance by Underwriters of a revised policy in 1976 because Federal Leasing had not received proper notice of termination.[12] Eventually, Underwriters agreed, and accordingly a third Master Policy covering the period from September 1, 1976 to August 31, 1977 was issued to Federal Leasing on the same terms as the two prior Master Policies.

On March 25, 1977, the totally unexpected event occurred which subsequently led to this and other litigation involving Underwriters and computer leasing companies. On that date, International Business Machines (hereinafter "IBM"), the industry giant, announced introduction of its new 3000 Series computer equipment. This announcement created havoc in the computer leasing market because not only was the new product vastly superior to existing equipment, but also its cost was considerably less. IBM had also announced at the same time that it was reducing the cost of its existing equipment by almost one-third.

---

11. By February 24, 1978, Federal Leasing had paid Underwriters premiums amounting to some $3.75 million.

12. Each annual Master Policy was automatically renewable for an additional one-year period unless notice of cancellation was received at

least 60 days before the expiration date. Since Underwriters did not give Federal Leasing timely notice of the intended revisions in the Master Policy, the third Master Policy, when it became effective on September 1, 1976, contained the same terms as the first two.

These unexpected developments presented obvious financial incentives for the termination of agreements and leases by Federal Leasing's customers. Moreover, these new market circumstances made it difficult if not impossible for Federal Leasing to recoup losses resulting from the terminations, since the old equipment could not be remarketed except at a greatly reduced price. Since IBM's announcement in 1977, Federal Leasing has received 169 notices of termination from customers.

Since losses of the sort encountered after the spring of 1977 were the very risks covered by the indemnity insurance policies, Federal Leasing quite naturally filed claims against Underwriters to recover the amounts involved. During the last half of 1977, Federal Leasing filed thirty-seven claims with Underwriters, totaling several million dollars. Although they had duly paid previous claims without objection, Underwriters suddenly asserted that they were not obligated to pay any of these new claims. Underwriters contended for the first time that the Master Policies created so-called "end of the day" obligations. Underwriters took the position that they were not obligated to pay any claim until the end of the entire term of the particular conditional sales agreement or lease involved, since Federal Leasing's true net loss could not be determined before then.

This surprising interpretation of the indemnity policies placed Federal Leasing in a precarious financial position. Federal Leasing was obligated to pay investors for the losses sustained while being denied recovery from the insurers for the very risk insured against. In pressing for immediate payment of its claims under the policies, Federal Leasing pointed out to the insurers that the insurance in question would prove to be of little worth to Federal Leasing if the proceeds could not be recovered until some three or four years after Federal Leasing was obligated to pay the investor for the loss. By that time, Federal Leasing would have had to pay investors many millions of dollars, and Federal Leasing did not have the financial capability of meeting such large obligations. As Federal Leasing correctly asserted, the basic purpose of this indemnity insurance was to provide for the immediate payment of proper claims asserted by the investors because of terminations. In making its position known to Underwriters, Federal Leasing threatened immediate legal proceedings unless Underwriters paid the outstanding claims promptly.

When advised of the strong position that Federal Leasing had taken concerning the payment of these claims under the policies, representatives of Underwriters commenced negotiations in an effort to settle the dispute. Nottage feared the domino effect that litigation would have insofar as other computer indemnity business was concerned and also the adverse impact that law suits would have on Lloyd's reputation in the United States. On February 21, 22 and 23, 1978, Nottage met with officials of Federal Leasing in London. At the conclusion of that meeting, Nottage recommended that Underwriters reach an accommodation with Federal Leasing. Indeed, American counsel for Underwriters had advised their client that the insurance policies could not properly be interpreted to provide that no claims were required to be paid until the end of the term of the particular conditional sales agreement or lease involved.[13] On February 27, 28 and March 1, 1978, a representative of the lead underwriter met with Underwriters' American general counsel to discuss the situation. Another meeting was scheduled for March 10, 1978 with Nottage, Underwriters' American counsel, the officers of Federal Leasing and Federal Leasing's counsel. It was at that meeting that the details of a compromise agreement between Federal Leasing and Underwriters were worked out.

On March 13, 1978, a detailed written agreement was executed on behalf of both Federal Leasing and Underwriters. This

---

13. There is no merit to Underwriters' contention that evidence concerning counsel's opinion to this effect cannot be considered by the Court because of a lawyer-client privilege. If such a privilege in fact existed, it was waived by Underwriters under the circumstances here.

Agreement (hereinafter referred to as "the March 13 Agreement") is of critical significance in this suit. It is a nine-page document (not including attachments) carefully drawn by experienced counsel with full knowledge of all the facts and circumstances pertaining to the issuance of the insurance policies and Federal Leasing's claims thereunder. The March 13 Agreement represented a settlement of the dispute on terms acceptable to both sides and was intended to protect and further the rights of both Federal Leasing and Underwriters.

Underwriters agreed that after a claim had been filed and Underwriters had determined that the claim appeared to be valid and that Federal Leasing was complying with the due diligence clause, Underwriters would promptly advance to the investor sufficient funds to satisfy Federal Leasing's obligations. In return, Federal Leasing agreed to pay Underwriters all proceeds it collected as a result of the remarketing of the computer equipment involved in a cancellation but not more than the amount of the loss paid by Underwriters. In addition, Underwriters agreed that seventeen outstanding claims were in fact valid, and Underwriters agreed to pay those claims.

The March 13 Agreement was circulated among all the underwriting syndicates which had accepted portions of the risks covered by these policies. Each of these many syndicates expressly approved the Agreement, and the Agreement by its terms became fully effective on April 1, 1978. On April 6, 1978, Underwriters paid $1,581,774.16 due on the seventeen claims which were outstanding at the time of the March 13 Agreement. Thereafter, between March 1978 and January 1979, Underwriters paid, pursuant to the March 13 Agreement, $7,095,143.83 on eighteen separate additional claims.[14]

Suddenly, in February 1979, Underwriters stopped paying claims as required by the March 13 Agreement. The record discloses that this action was not taken because of the discovery of any previously unknown facts which would amount to a proper defense to the claims. Rather the only reason for the refusal by Underwriters to honor the terms of the March 13 Agreement was the large number of claims which were then being filed. In March 1979, Underwriters appointed First National Bank of Boston as claims adjuster and a moratorium was placed on the further payment of claims.[15]

Caught between the investors' pressing demands for payment of their legitimate claims and Underwriters' refusal to pay for these losses under the insurance policies and the March 13 Agreement, Federal Leasing filed this pending action on June 12, 1979. Since this action was filed, a few claims have been paid by Underwriters. In June 1979, a claim in the amount of $1,789,412.19 was paid. On December 10, 1979, this Court approved the settlement of the claims of Barnett Leasing Company in the amount of approximately $1,765,000.[16] No other claims by Federal Leasing have been paid or settled.

Federal Leasing's predicament has become more acute as a result of litigation in other courts against it. Several investors have sued Federal Leasing in other state or federal courts, and in one of these cases, a substantial judgment against Federal Leasing alone has been obtained by an investor. Sun Life Insurance Company of America, Union Central Life Insurance Company and Skokie Trust & Savings Bank, assignees of certain claims of the Bank of California involved here, have a suit pending in the Superior Court of Baltimore City, seeking judgment against Federal Leasing and Underwriters in the amount of some $3,882,-840. Oak Park Trust & Savings Bank has an action pending in the United States District Court for the Northern District of

14. Underwriters did refuse to pay one claim because the particular facts indicated that the claim was not a valid one.

15. However, in March and April of 1979, Underwriters did pay $866,149.31 on three claims.

16. Barnett's claims had been originally included in this suit.

Illinois, seeking judgment in the amount of $243,525. The Bank of Lincolnwood also filed suit against both Federal Leasing and Underwriters in the Northern District of Illinois. On August 27, 1979, Judge Marshall granted judgment on the pleadings against Federal Leasing in the amount of $476,621.35. Although a pending cross-claim in that action asserted by Federal Leasing against Underwriters was not resolved, Judge Marshall certified the judgment against Federal Leasing as a final and enforceable judgment pursuant to Rule 54(b), F.R.Civ.P. The Bank of Lincolnwood promptly sought to execute on its judgment. However, execution on the judgment has now been stayed pending Federal Leasing's appeal of the propriety of the Rule 54(b) certification, a matter which is presently before the Seventh Circuit.

As of March 31, 1979, Federal Leasing's net worth was $1,559,902. Underwriters are and have been well aware of the limited resources available to Federal Leasing for the payment of the large outstanding claims of the investors. The record establishes that if all the claims against Federal Leasing as to which this Court does not have jurisdiction were reduced to judgment, Federal Leasing would be rendered bankrupt.

## IV

### Plaintiff's Motion for a Preliminary Injunction

#### (a) General principles

■ Whether to grant or deny a motion for a preliminary injunction is a decision committed to the sound discretion of the trial court. *First-Citizens Bank & Trust Co. v. Camp*, 432 F.2d 481, 483 (4th Cir. 1970). A court's discretion must be guided by the historic principles of equity as developed by the federal courts. *See Paschall v. Kansas City Star Co.*, 441 F.Supp. 349, 355 (W.D.Mo.1977). A preliminary injunction is an extraordinary remedy which should not be granted unless the moving party clearly establishes that it is entitled to the relief sought. *Valentine v. Indianapolis-Marion County Building Au-*

*thority*, 355 F.Supp. 1240, 1241 (S.D.Ind. 1973); 11 Wright and Miller, *Federal Practice and Procedure*, § 2948 (1973).

■ The principle purpose of a preliminary injunction is to preserve the *status quo* during the course of a litigation in order to prevent irreparable injury to the moving party and in order to preserve the ability of the court to render complete relief. *Benson Hotel Corp. v. Woods*, 168 F.2d 694, 696–97 (8th Cir. 1948); *see also Singleton v. Anson County Board of Education*, 387 F.2d 349, 350 (4th Cir. 1967). The *status quo* has been consistently defined as the last uncontroverted status preceding the pending litigation. *See, e. g., Tanner Motor Livery v. Avis, Inc.*, 316 F.2d 804, 808–09 (9th Cir.), *cert. denied*, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963); *Westinghouse Electric Corp. v. Free Sewing Machine Co.*, 256 F.2d 806, 808 (7th Cir. 1958).

#### (b) The status quo

■ Each side here asserts that it is attempting to preserve the *status quo ante litem*. Underwriters define the *status quo* as their refusal to pay the claims prior to commencement of this action on June 12, 1979, and asks this Court to deny the motion on that ground alone. Federal Leasing defines the *status quo* as the actual payment of claims by Underwriters before February 1979, and asks this Court to order Underwriters to immediately pay to the investors the claims covered by this action. Neither party is correct in their interpretation of the *status quo* as applied to the circumstances of this case. This Court concludes that the *status quo* in this case is represented by the March 13 Agreement and the actions taken by the parties under that Agreement between April 1, 1978 and February 1979.

The March 13 Agreement required Underwriters to review each claim by Federal Leasing immediately upon submission. Only after Underwriters had determined that a particular claim appeared to be valid were Underwriters obligated to provisionally pay that claim, and Federal Leasing was

then obligated to comply with the remarketing requirements. From April 1978 to February 1979, Underwriters honored the terms of this Agreement, as did Federal Leasing. During that ten-month period, Underwriters reviewed all the claims submitted and provisionally paid all of them except one, which Underwriters determined to be invalid. The present controversy between Federal Leasing and Underwriters did not arise until February or March of 1979, when Underwriters' claims adjuster suddenly placed a moratorium on the payment of further claims. Since then, Underwriters have not complied with the terms and provisions of the March 13 Agreement, other than to settle a few of the claims asserted against them.

On the other hand, Federal Leasing has strictly complied with the terms of the March 13 Agreement in spite of Underwriters' refusal to fulfill their obligations. In connection with the claims pressed in this suit, Federal Leasing has received $1,344,-466 in remarketing proceeds, while incurring $435,316 in remarketing expenses. As required by the Agreement, Federal Leasing has remitted the difference of approximately $900,000 to Underwriters. Underwriters have retained these sums even though under the terms of the March 13 Agreement, Underwriters are not entitled to this money until the claims in question have been paid.[17]

■ Under these circumstances, if Federal Leasing is entitled to a preliminary injunction, it would not at this time be entitled to immediate payment by Underwriters of all the claims listed in the motion. Ordinarily, a party seeking a preliminary injunction is not entitled to monetary relief. *Sims v. Stuart*, 291 F. 707 (S.D.N.Y. 1922) (L. Hand, J.); *SCM v. Xerox Corp.*, 507 F.2d 358 (2d Cir. 1974); *Dorfmann v.*

*Boozer*, 414 F.2d 1168, 1173–74 (D.C. Cir. 1969). However, where as here the payment of money is merely a part of the obligations undertaken by a party under a binding agreement, a preliminary injunction is an appropriate remedy. *Columbia Broadcasting System, Inc. v. American Society of Composers, Authors and Publishers*, 320 F.Supp. 389 (S.D.N.Y.1970).[18] It has also been held that a preliminary injunction will issue to enforce compliance with a contract's terms, where a defendant has not been able to justify its violation of the terms on the ground of fraud or mistake. *United States Air Conditioning Corporation v. Fogel*, 172 F.Supp. 539, 543 (E.D.Pa.1959), *aff'd* 272 F.2d 879 (3d Cir. 1959).

In this case, this Court concludes that the *status quo ante litem* is the performance in good faith by both sides of the obligations they undertook in the March 13 Agreement. In that Agreement, Underwriters agreed to review and pay claims determined to be valid. If Federal Leasing is entitled to a preliminary injunction under the facts of this case, this Court will require Underwriters to honor the terms of the March 13 Agreement and live up to their obligations thereunder, as it was doing before February 1979.

### (c) *Federal v. State law*

■ Although the authorities are split concerning whether federal law or state law governs the issuance of a preliminary injunction in a diversity action, *see Kaiser Trading Co. v. Associated Metals and Minerals Corp.*, 321 F.Supp. 923, 931, n.14 (N.D. Cal.1970), this Court concludes that the better view is that federal law is controlling. 11 Wright and Miller, *Federal Practice and Procedure*, § 2943 (1973).

Since Rule 65(a), F.R.Civ.P., governs the issuance of preliminary injunctions, it is

---

17. Underwriters finally, in January 1980, offered to return to Federal Leasing these remarketing proceeds, some six months after suit was filed and four months after the filing of the pending motion for a preliminary injunction. Clearly, this belated offer was made for tactical reasons and is not pertinent to the Court's determination of the *status quo ante litem*.

18. Under appropriate circumstances, a court will issue a mandatory injunction ordering a defendant to pay money during the pendency of a suit in order to avoid immediate and irreparable injury. *Barnes v. Converse College*, 436 F.Supp. 635, 638 (D.S.C.1977); *Ross v. Community Services, Inc.*, 396 F.Supp. 278 (D.Md. 1975).

clear that an important federal policy is involved when a litigant seeks such relief in a federal court. In light of this important federal policy, federal law, not state law, should apply in a diversity action in which a preliminary injunction is sought. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

### (d) *The Fourth Circuit standards*

 The proper standard to be applied in this case in determining whether a preliminary injunction should issue is the flexible "balance of hardship" test enunciated in *Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc.*, 550 F.2d 189 (4th Cir. 1977); *see also Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4th Cir. 1980). Underwriters contend that a stricter standard than that of *Blackwelder* should be applied in this case because Federal Leasing is attempting to change the *status quo* by means of a mandatory preliminary injunction. This contention is without merit. As previously noted, the *status quo ante litem* is the processing of claims by Underwriters under the March 13 Agreement and the payment of those claims which are valid. Any injunction entered in this case would seek to maintain rather than alter the *status quo* during the pendency of this action. Although some courts have suggested that mandatory preliminary relief is to be granted only sparingly, this suggestion was hardly intended as a recognized principle which would prohibit a court from issuing a preliminary injunction in a case where a moving party has clearly demonstrated its entitlement to such relief. *See National Association of Letter Carriers, AFL-CIO v. Sombrotto*, 449 F.2d 915 (2d Cir. 1971). In a proper case, a federal court has not hesitated to issue a mandatory preliminary injunction. 11 Wright and Miller, *Federal Practice and Procedure*, § 2948 (1973). Under the circumstances here, this Court is satisfied that the *Blackwelder* test applies in this case. If Federal Leasing can prove that it has met the flexible "balance of hardship" test of *Blackwelder*, a preliminary injunction will issue, even though it may be mandatory.

In *Blackwelder*, the Fourth Circuit first referred to the four factors which had been recognized in previous opinions of that Court as a "rule of thumb" for the granting of equitable relief. The Court then went on to refine the test as follows:

> The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success. Always, of course, the public interest should be considered.

550 F.2d at 196.

However, the Court also pointed out that the importance of probability of success increases as the probability of irreparable injury diminishes. 550 F.2d at 195. Thus, these two factors must be considered at the outset in relation to each other.

 In this particular case, this Court finds and concludes that the likelihood of irreparable harm to the plaintiff, although present, is not as strong a factor as the probability of the plaintiff's success. Here the plaintiff has a very high probability of ultimately prevailing and has also shown that it will probably suffer irreparable injury if the injunction does not issue. Balancing these factors together with the other two mentioned in *Blackwelder*, this Court concludes that plaintiff is at this time entitled to a preliminary injunction which would restore the *status quo*.

### (e) *Probability of success*

Since the most significant of the four criteria here is that of probability of success, this factor will be discussed first. What is apparent from this record is that defendants undertook to insure a risk which was thought to have very little likelihood of ever occurring. When the unexpected events did in fact occur, defendants were suddenly faced with liabilities of a very large magnitude. Although initially agreeing in March 1978 to pay valid claims as presented and in fact paying them, defend-

ants suddenly in early 1979 decided that their interests would be furthered by tactics of delay. Defendants reneged, not only insofar as their obligations under the original policies were concerned, but also with reference to the more recent obligations assumed under the March 13 Agreement.

Since this suit was filed, defendants have been fighting a holding action, seeking to delay the payment of their obligations under the insurance policies. The defenses they have now asserted are no more than afterthoughts put together after the fact by defendants' attorneys but not supported by the weight of the evidence in this record. This is quite apparent from the fact that since 1974 when the first of these policies issued, defendants have paid out some $15 million as a result of claims asserted under the policies. Yet defendants now assert that the initial policy was void *ab initio* because of misrepresentations made by plaintiff at the very outset and that all these claims have been improperly paid. It strains credulity to believe that the misrepresentations claimed, if in fact they existed, could not have been discovered during the five years between 1974 and 1979, when suit was filed. Underwriters are composed of syndicates which are as sophisticated in insurance matters as any insurance companies in the world. Experienced and knowledgeable representatives of Underwriters studied and reviewed the original application for the insurance in 1974. Between September 1974 and August 1976, Underwriters declined new business while undertaking a thorough and extensive re-review of this new class of business and of the underwriting risks involved. Not once was it suggested that the basic policy issued to Federal Leasing was the result of fraud.

Most importantly, after the IBM announcement in 1977 and after holding up on the payment of valid claims, Underwriters entered into the March 13 Agreement. This Agreement followed numerous meetings held by representatives of Underwriters and further meetings between attorneys for the parties. At no time during these discussions did representatives of Underwriters ever suggest that the basic policy was void *ab initio* because of fraud. Rather, the differences of interpretation were resolved, a settlement of the dispute was reached, and Underwriters agreed to honor the financial obligations it had assumed under the insurance policies. Between April 1, 1978 and February 1979, Underwriters did carry out the obligations assumed under the Agreement and several more million dollars of claims were paid. When Underwriters suddenly stopped paying the claims in February 1979, it was not because any misrepresentation on the part of Federal Leasing had been discovered. The sole reason why the insurers stopped paying the claims was that the number and the amount of the claims had greatly increased and the insurers had apparently decided that they would stand to gain in the long run by refusing to honor the commitments they had undertaken in the March 13 Agreement. Underwriters knew that Federal Leasing did not have the financial resources to meet its obligations to the investors and apparently hoped to benefit by placing Federal Leasing in the financial bind which would result from delay in the payment of the insurance proceeds.

Underwriters now take a position which was never previously mentioned in the years that the parties dealt with each other. It is now claimed that the Master Policies are invalid because they were procured at the outset by misrepresentation and that the March 13 Agreement is also invalid because it merely implements the Master Policies. In support of their position, Underwriters rely on the affidavit of Paul Williams, deputy lead underwriter. In his affidavit, Williams states that in 1974 Nottage informed him that the lender financing a transaction would agree to lend money to a computer leasing company based upon the lender's own review of the transaction and without regard to the fact that the transaction might be covered under a Master Policy. Williams also avers that he was informed that no transaction would be presented for insurance if the assured had reason to believe that the user would exercise its right of early termination. Under-

writers contend that these representations were false and material, thereby rendering the Master Policies void from the outset.

[12] This Court would first note that the Williams affidavit does not state that any representative of Federal Leasing made any of these representations. The affidavit refers only to Nottage, and there is nothing in the record to indicate that Nottage was the agent of Federal Leasing. On the contrary, the record here discloses that Nottage, whose office was in London, was not the agent of Federal Leasing. Nottage had had a continuous business relationship with Underwriters for over twenty years, and prior to 1974 had not had any direct contact with Federal Leasing. Most importantly, during the negotiations leading up to the March 13 Agreement, Nottage reported directly to the lead underwriting syndicate, on whose behalf he was negotiating. Moreover, there is nothing in the record to indicate that Federal Leasing ever authorized Nottage to negotiate the 1974 Master Policy on its behalf. In the absence of such authorization, Federal Leasing cannot be held responsible for any of Nottage's alleged misrepresentations. It is axiomatic that a party is not responsible for the acts and statements of a third-party which it did not authorize and of which it had no knowledge.

In any event, other evidence in this record indicates that these representations were never made. From September 1974 to August 1976, Underwriters engaged in an extensive review of these computer lease indemnity policies. As a result of that review, Underwriters issued in 1976 a revised standard Master Policy which included specific requirements very similar to the representations allegedly made by Nottage in 1974. Federal Leasing objected to the revised 1976 policy on the ground that it had not received sufficient notice of the cancellation of its 1975 Master Policy. Eventually, Underwriters agreed, and Federal Leasing's 1976 policy was in the same form as the two earlier policies. If the terms in question were already a part of the 1974 and 1975 Master Policies, Underwriters would not have required two years of experience to determine that these provisions should have been included in the written policy, and Federal Leasing would have had no reason to object to the revised Master Policy in 1976. It is clear that in 1976, Federal Leasing took the position that there was a substantial difference between the revised policy and the two previous policies. When Underwriters agreed to issue the 1976 policy in the same form as the earlier ones, they accepted Federal Leasing's interpretation.

Moreover, Underwriters would not be permitted to modify the terms of the written Master Policies by proof of these alleged oral representations. The Master Policies provide that they are to be construed in accordance with the laws of the State of Maryland. It is well settled in Maryland that a written contract merges all prior and contemporaneous negotiations on the subject matter of the contract. *Trotter v. Lewis*, 185 Md. 528, 45 A.2d 329 (1946). The intention of the parties must be ascertained from the terms of the written agreement. *Rafferty v. Butler*, 133 Md. 430, 105 A. 530 (1919). Underwriters' failure to include these alleged oral representations in the final written contracts amounts to a waiver by Underwriters of these alleged terms as a part of the agreements.

Underwriters also rely on certain written statements made in an application submitted by Federal Leasing while negotiations were under way concerning a proposed revised Master Policy. In the application, Federal Leasing made the following two statements:

> The fact that we used our Lloyd's Policy was secondary to financial institutions' requirements since they considered this as solely a vehicle required by State and National banking laws which require a firm commitment without contingency liabilities.
>
> * * * * * *
>
> We will not consider enacting a contract with a user if we are aware of any circumstance which knowingly can cause a cancellation.

Underwriters contend that these statements and others similar to them made in 1976 prove that Federal Leasing had made similar representations in 1974. This Court would disagree. There is nothing in the statements themselves made in 1976 or elsewhere in the record to indicate that Federal Leasing made those same statements in 1974. Statements made by Federal Leasing in 1976 could hardly have been relied upon by Underwriters when they issued the 1974 and 1975 Master Policies.

Even if the representations relied upon were made and were false, the Master Policies would not be void. Under Maryland law, only a material misrepresentation in an application for insurance will render the policy void. *John Hancock Mutual Life Insurance Co. v. Adams*, 205 Md. 213, 221, 107 A.2d 111 (1954). A misrepresentation is material if a reasonably careful and intelligent person would have regarded the fact communicated at the time of effecting the insurance as substantially increasing the chances of the loss insured against. *Maryland Indemnity and Fire Insurance Exchange v. Steers*, 221 Md. 380, 385, 157 A.2d 803 (1960); *Hofmann v. John Hancock Mutual Life Insurance Co.*, 400 F.Supp. 827, 830 (D.Md.1975).

From 1974 to the present, Underwriters have consistently recognized that the risk insured by the Master Policies was the inability of Federal Leasing to remarket the equipment which had been returned following termination of a lease or conditional sales agreement before the end of the specified term. In evaluating this risk, Street-Porter, the lead underwriter, considered the following two factors to be controlling: (1) the possibility of a marked decrease in prices, and (2) the possibility of rapid technological advancement. In the absence of these two factors, Street-Porter concluded that the American market was large enough to guarantee that any equipment returned following cancellation of an agreement could be readily remarketed with little or no loss resulting. Therefore, factors such as the investor's independent review of a transaction and the intention of the user

as to early termination had little to do with the decision to issue the first Master Policy in 1974 and were not material factors in Street-Porter's evaluation of the risk at that time. Factors such as the latter did not significantly increase the risk that terminated equipment could not be remarketed. Since the alleged misrepresentations relied upon did not affect Underwriters' evaluation of the risk insured against, they were not material to the issuance of the policies and this would not void the Master Policies and the March 13 Agreement.

Underwriters also contend that the Master Policies are void because Federal Leasing submitted several fraudulent claims. The Master Policies provide:

> If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

Underwriters argue that Federal Leasing misrepresented the facts concerning some of the transactions because, when some of the cover notes were issued, Federal Leasing was aware of circumstances which would have caused the users involved to cancel. This argument is inherently implausible. Federal Leasing would have little to gain and much to lose if it entered into a transaction knowing or believing from the outset that the user intended to exercise its right of early termination. When there was a cancellation, Federal Leasing assumed new obligations which it hardly would wish to undertake from the outset. Federal Leasing would incur fewer expenses if the leases and agreements continued to the end of their term, and therefore stood to lose if leases and agreements were terminated early.

Certainly, when the three Master Policies were issued, Federal Leasing had no prior knowledge of the events which in fact led to the terminations. As the record here indicates, the reason for the mass terminations after 1977 was the development by IBM of technologically superior equipment to be sold at a lesser price. Neither Federal Leasing nor anyone else could possibly have

known of or anticipated this development which was unprecedented in the industry.

In particular, Underwriters contend that Federal Leasing's claims arising out of transactions with Transamerica Information Services (hereinafter "Transamerica"), as alleged in Counts 20 and 21 of the complaint, were fraudulent because Federal Leasing knew when it applied for the coverage of these transactions that the equipment was intended only for interim use. Transamerica acquired its original computer equipment from Federal Leasing in June 1976. That lease obligated Federal Leasing to supply Transamerica with any add-on equipment required, provided that the cost satisfied a formula contained in the lease. In March 1977, when IBM announced the availability of its new equipment, Transamerica immediately placed an order for two Series 3000 computers. On October 20, 1977, Federal Leasing submitted a proposal to Transamerica for the lease of the new Series 3000 computers. Subsequently, Federal Leasing submitted declarations to Underwriters for coverage of various add-on transactions involving Transamerica's old Series 370 computers.

On the record here, this Court finds that Transamerica did not decide to replace its existing equipment until early 1978, after the cover notes were issued. Federal Leasing's proposal of October 20, 1977 was not intended to induce Transamerica to cancel its existing leases. The proposal specifically stated that the lease of the Series 3000 computers was to be in addition to Transamerica's existing equipment, with certain financial adjustments being made. This proposal· was in fact an attempt to prevent early termination, not to encourage it. This Court concludes that Federal Leasing's representations relating to this transaction were not knowingly false and therefore would not void the Master Policies.

Underwriters also contend that the claim for the fourth North Carolina transaction, set forth in Count 13D of the complaint, was fraudulent because the contract was terminated by the user before the cover note was issued. The documents relating to this transaction establish, however, that the cover note was issued on August 8, 1978 and that the notice of termination was not received until August 17, 1978. Therefore, Underwriters' claim of fraud as to this transaction is also without basis.

Other defenses asserted by Underwriters to the payment of these claims are equally specious. The Master Policies were never intended to provide for the payment of the claims by Underwriters at the end of the term of a lease or conditional sales agreement. The policies had never been so interpreted by representatives of Underwriters when claims aggregating $15 million were paid between 1974 and 1979. Underwriters' own counsel advised defendants that the policies could not be so interpreted, and this contention was abandoned when the March 13 Agreement was executed.

Underwriters argue that they are not bound by the terms of the March 13 Agreement because they reserved all their rights, including the defenses now asserted. In making this contention, Underwriters rely on Paragraph V of the Agreement which provides as follows:

## V. RESERVATION OF RIGHTS

Underwriters do not waive their rights to contest any claim funded hereunder on the basis of facts not now known to them, but subsequently discovered. Underwriters and the Assured reserve all rights under the Policy, and any other agreements, written or otherwise, made in connection therewith.

There is no merit to this argument. The facts now relied upon in support of the defense of misrepresentation are not "subsequently discovered" facts, but were well known to Underwriters and their agents when the Master Policies were issued. In any event, this Court has concluded on the record here that there were no material misrepresentations made by Federal Leasing or its agents which would void these policies.

In sum, the extensive record presently before the Court establishes that Federal Leasing has a very high probability of ultimate success in this case. At the trial,

Federal Leasing will very probably be able to show that the three Master Policies and the March 13 Agreement are valid and enforceable agreements.

### (f) *Irreparable harm*

Considering next the factor of irreparable harm to the plaintiff, this Court finds it probable that Federal Leasing will be irreparably harmed if a preliminary injunction is not issued. Several investors currently have asserted claims against Federal Leasing in other courts totaling over $4 million, and in one of the pending cases, a judgment has already been entered against Federal Leasing in the amount of approximately $500,000. Federal Leasing has no viable defense to these claims and has sought to protect itself by claiming over against Underwriters under the insurance policies. If separate judgments are entered in favor of the investors against Federal Leasing (as in fact occurred in the suit brought by the bank of Lincolnwood in federal court in Illinois), and if Federal Leasing is required to pay these judgments before its claims against Underwriters are finally adjudicated, then Federal Leasing would be forced into bankruptcy. Such an eventuality would obviously affect Federal Leasing's ability to prosecute this suit to an ultimate conclusion.

■■■■ Underwriters' contention that bankruptcy does not constitute irreparable injury is without merit. If the potential economic loss is so great as to threaten the existence of the moving party's business, a preliminary injunction is appropriate if the other prongs of the test are met. *See Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970). This is particularly true when the bankruptcy of the moving party would hinder its ability to prosecute a bona fide claim. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975).

On the other hand, this Court finds that Underwriters would not be harmed if a preliminary injunction is entered directing them to comply with the terms of the March 13 Agreement. Some of the claims are unquestionably valid and should be paid at once. Others may be determined to be invalid and may not have to be ultimately paid. The payment of valid claims as required by the March 13 Agreement will not harm Underwriters any more than did similar payments willingly made by them before April 1, 1978 and February 1979.

Underwriters contend that they will be harmed if they pay claims now and if later they are successful on the merits and cannot recover the money from investors not subject to the jurisdiction of this Court. However, most of the investors involved in the transactions which have resulted in the claims asserted here are parties to this action. In any event, any possible risk of ultimate harm to Underwriters can be eliminated by requiring an investor receiving a payment to post an adequate surety bond. *Costandi v. AAMCO Automatic Transmissions, Inc.*, 456 F.2d 941, 943 (9th Cir. 1972). This question will be further considered when an appropriate Order is entered by the Court.

On the record here, this Court finds and concludes that the plaintiff will probably suffer irreparable harm in the absence of the entry of a preliminary injunction. On the other hand, any harm to the defendants if a decree is entered would be slight and is in any event outweighed by the harm to the plaintiff if there is no decree. Underwriters have a $1.8 billion trust fund in a New York bank available for the payment of claims against Lloyd's arising in the United States, including claims under computer leasing indemnity policies.

### (g) *Plaintiff's entitlement to a preliminary injunction*

Balancing all of the factors of the *Blackwelder* test,[19] this Court concludes that Federal Leasing is entitled to a preliminary injunction which would require that Underwriters comply with the terms of the March

---

**19.** The final factor mentioned in *Blackwelder* relates to the public interest. Since this case involves a dispute between private parties, the public interest is not a significant consideration in determining whether a preliminary injunction should issue.

13 Agreement during the pendency of this litigation. Federal Leasing has established that it may be irreparably injured if an injunction is not entered, while Underwriters will not be essentially harmed if it is. The most significant factor here is that Federal Leasing has demonstrated a very high probability of success in proving that the Master Policies and the March 13 Agreement are valid.

Under all these circumstances, a preliminary injunction is appropriate.[20] Accordingly, Federal Leasing's motion for a preliminary injunction will be granted in part, and an appropriate preliminary injunction will be entered by the Court.

## V

### The Form of Relief

■ The preliminary injunction to be entered by the Court will not directly order Underwriters to pay any of the claims involved in this litigation. The injunction will require Underwriters to comply with the provisions of the March 13 Agreement and to process claims for payment in the same manner as it did after April 1, 1978. In so complying, Underwriters should certainly pay some of the claims without delay. For example, Count 1 of the complaint asserts a claim on behalf of Kirchner. Underwriters have informed Kirchner that its claim was valid and would be paid. No reason therefore exists why that claim should not be promptly paid. Similarly, as discussed *supra*, there is no substance to the defense presented by Underwriters to the claim asserted in Count 13 on behalf of Suburban Trust. Other similar claims should likewise be paid under the March 13 Agreement.

On the other hand, the processing in good faith of certain other claims may disclose that they should not be paid. For example,

Underwriters contend that some transactions were declared before the user agreement was executed. Such an occurrence would be a violation of terms of the Master Policies. Further investigation of the facts is necessary before a decision can be made by Underwriters concerning claims of this sort.

If sound reasons exist for declining to pay a claim, Underwriters would not be required to make the payment in question. Explicit reasons should be given by Underwriters for the non-payment of a claim. However, it would be a violation of the March 13 Agreement and of the preliminary injunction if the reasons advanced by Underwriters are clearly without foundation or designed for purposes of delay.[21] Performance by Underwriters under the injunction should be measured by their performance of the March 13 Agreement between April 1, 1978 and February 1979. During that period, Underwriters complied with the terms of the Agreement, paying most of the claims presented and declining to pay invalid claims. The injunction to be entered herein will compel Underwriters to continue to perform in that manner during the pendency of this litigation.

## VI

### Suburban's, Allstate's and Kirchner's Motions for a Preliminary Injunction

Little time need be devoted to a discussion of the pending motions for a preliminary injunction filed by Suburban, Allstate and Kirchner. Federal Leasing's motion and these motions overlap. Most of the relief sought by the investors' motions will be obtained as a result of the entry of a preliminary injunction in favor of Federal Leasing.

■ These investors are not at this time entitled to a preliminary injunction order-

20. Underwriters' final defense that Federal Leasing is barred from equity by the "clean hands" doctrine is without merit. This Court has found no evidence of fraud or misrepresentation on the part of Federal Leasing which would defeat its right to the equitable relief sought.

21. In particular, Underwriters may not rely on any defense which this Court has considered and rejected in this Opinion.

**1268**

ing Underwriters to pay their claims at once. Some of the claims will of course be promptly paid when defendants comply with the March 13 Agreement as ordered. However, unlike Federal Leasing, the investors have not shown that they will suffer irreparable injury if their motions are not granted. Accordingly, the motions for a preliminary injunction of Suburban, Allstate and Kirchner will be denied. *United States v. Pennsylvania*, 533 F.2d 107 (3d Cir. 1976).

## VII

### *Underwriters' Motion for a Preliminary Injunction*

█ Underwriters have moved to enjoin Federal Leasing from prosecuting in any other court any claim against them related to the pending case. Underwriters contend that any such litigation would be harassing and vexatious. An injunction of the sort requested is appropriate only if the other actions were instituted for the purpose of harassment. 11 Wright and Miller, *Federal Practice and Procedure*, § 2942 (1973).

█ It should first be noted that Federal Leasing has not instituted any action against Underwriters in any other court, nor has it indicated any desire to do so. Both Underwriters and Federal Leasing are co-defendants in several suits filed by investors in other courts. In these suits, Federal Leasing has indeed filed cross-claims against Underwriters. Such cross-claims are necessary to prevent Federal Leasing from bearing the entire burden of the judgments by itself.

Clearly, it is not harassment if Federal Leasing files a cross-claim against Underwriters in a suit pending in another court in which both parties have been named as defendants. Such action on the part of Federal Leasing is an entirely legitimate and appropriate response to the assertion by an investor of a claim against Federal Leasing which the latter contends is covered by the insurance. As discussed herein, Federal Leasing's financial resources are not sufficient to permit it to pay investors' claims and then await the conclusion of this litigation before collecting the insurance.

On the record here, this Court finds that the prosecution by Federal Leasing of claims against Underwriters in other courts would not be vexatious or harassing. Accordingly, Underwriters' motion for a preliminary injunction will be denied.

## VIII

### *Conclusion*

For the reasons stated, plaintiff's motion for a preliminary injunction is hereby granted in part. Counsel should consult and submit an appropriate Order within fifteen days. If counsel are unable to agree on the form of an Order, each side should submit a proposed Order to the Court within fifteen days. A further hearing will be scheduled, if necessary.

The motions for a preliminary injunction of defendants, of Suburban and of Allstate and Kirchner will be denied. Orders have been entered today denying these motions.