**FEDERAL LEASING, INC. et al., Appellees,**

**and**

**The Bank of California, N.A. et al., Plaintiffs,**

**v.**

**UNDERWRITERS AT LLOYD'S et al., Appellants,**

**v.**

**SUBURBAN TRUST COMPANY, a Maryland Corporation, Appellee,**

**and**

**Federal Leasing, Inc. et al., Counterdefendants.**

No. 80–1363.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1980.

Decided June 2, 1981.

**496**

Eugene F. Bannigan, New York City (John D. Gordan, III, Lord, Day & Lord, New York City, John E. Sandbower, III, Robert J. Carson, Phillips P. O'Shaughnessy, Smith, Somerville & Case, Baltimore, Md., on brief), for appellants.

John Doar, New York City, Benjamin Rosenberg, Baltimore, Md. (G. Stewart Webb, Jr., Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellee Federal Leasing, Inc.

Michael Sandler, Washington, D. C. (John E. Nolan, Jr., Steptoe & Johnson, Washington, D. C., on brief), for appellee Suburban Trust Co.

Before BRYAN, Senior Circuit Judge, and PHILLIPS and ERVIN, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

Federal Leasing, Inc. (Federal), a Maryland corporation engaged in the lease and sale of computer equipment, brought this action to recover damages, compensatory and punitive, of certain underwriters at Lloyd's, London (Underwriters), and a number of British insurance companies for their alleged breach of various "computer equipment lease indemnity policies."[1] These policies insure Federal against losses arising from obligations incurred by it in the financing of its transactions. The District Court entered a preliminary injunction requiring Underwriters to process claims pursuant to an agreement hereinafter treated of and previously negotiated with Federal; it is from this injunction, under which they have provisionally paid claims totalling over thirty million dollars, that Underwriters appeal.

After a hearing upon affidavits and counter-affidavits,[2] the District Judge, in accord with Fed.R.Civ.P. 52(a) and 65, upon findings of fact not proven clearly erroneous and upon sound conclusions of law, passed the decree of injunction in suit. *Federal Leasing, Inc. v. Underwriters at Lloyd's*, 487 F.Supp. 1248 (D.Md.1980). Adopting these findings and approving the legal conclusions, we affirm.

I.

Federal purchases computers from the manufacturer and then markets them, through leases or conditional sales agreements, to commercial and government

---

1. Jurisdiction rests on diversity of citizenship.

2. No request for an evidentiary hearing was made. These instruments yielded a voluminous record, the fruit of extensive discovery undertaken in the nearly six months between Federal's motion for preliminary injunction and the hearing thereon.

users. It borrows initial purchase money from banks, insurance companies, and other institutions (investors). In the lease transactions involved here, the purchase-money loan would be evidenced by Federal's note to the investor; to amortize the loan, Federal would assign to the investor all or part of the lease payments. In conditional sales contracts, Federal would assign the agreement with its future stream of principal and interest payments to the investor at a present-value discount.[3]

Although both types of contract typically extended over several years, each permitted the user on a specified notice to terminate without penalty after a shorter "firm" period. When a user exercised this privilege, Federal became obligated to the investor for the amount still owed under the original contract. The mechanics differed in the two types of transaction, but in each case Federal would attempt to make good its loss by placing terminated equipment with a new user, and we will refer to this operation generally as "remarketing."

Prior to March 1977, early terminations were not thought to present meaningful risks. Changes in the computer equipment market had been "evolutionary" rather than "revolutionary": improved capacity came only at significantly greater cost, and older computers retained value because of inflation, because they did not deteriorate, and because their capacity could be enhanced through "add-on" equipment. Thus, a user contemplating termination would be deterred by the higher cost of replacement equipment; moreover, in conditional sales transactions the user would be deterred by the sacrifice of equity built up in the course of payment. In these circumstances Federal generally could expect to remarket terminated equipment at a rate that would satisfy its obligations.

Nevertheless, a risk was there of an upheaval in market conditions. Federal and its potential investors realized that Feder-

al's financial structure was not equal to the demands that such a reversal, coupled with numerous terminations, would precipitate. Seeking a device which would afford investors additional security, Federal asked a Baltimore intermediary to ascertain whether Lloyd's of London would insure against the hazard that early terminations would occasion losses not recoverable through remarketing. Thus it learned that such a policy had already been devised for another computer leasing concern. One Peter Nottage, manager of a Lloyd's wholesale brokerage firm, had negotiated and drafted this prototype policy in conjunction with representatives of an underwriting syndicate at Lloyd's; Nottage now acted as broker for other potential assureds seeking the same coverage. Through Nottage, Federal first obtained coverage for a single transaction, and then a "master policy" under which individual transactions could be submitted for coverage. The master policy had a one year term commencing September 1, 1974, and was renewed for additional one-year periods in 1975 and 1976. Between 1974 and 1978 Underwriters insured Federal's transactions of approximately $130 million. Prior to March 1977, only thirteen early terminations occurred, and only seven of these led to claims against Underwriters, which paid them as they were presented.

On March 25, 1977, however, International Business Machines (IBM) introduced a new generation of computer far superior to, and far less costly than, earlier models, while simultaneously discounting its existing equipment. Federal's users thus were induced to terminate in unprecedented numbers, and the reduced market for older units effectively precluded remarketing at prices that would recoup Federal's losses. As the District Judge observed, these circumstances exampled "the very risks covered by the indemnity insurance policies," 487 F.Supp. at 1257, and in the last half of 1977 Federal presented thirty-seven claims amounting to several million dollars.

---

**3.** The leases and conditional sales agreements differed in ways that for the most part are not material to the present dispute. We therefore do not distinguish between them except when clarity of discussion requires it. We rely on the detailed exposition of the opinion below, and provide here only a simplified factual outline.

Notwithstanding its prior practice of paying claims as they were filed, Underwriters declined to honor these demands when presented. They now asserted that their master policy obligations matured only upon expiration of the entire term of each lease or conditional sales agreement, arguing that Federal's net loss was not ascertainable earlier.

This surprising interpretation . . . placed Federal Leasing in a precarious financial position. Federal Leasing was obligated to pay investors for the losses sustained while being denied recovery from the insurers for the very risk insured against. . . . As Federal Leasing correctly asserted, the basic purpose of this indemnity insurance was to provide for the immediate payment of proper claims asserted by the investors because of terminations.

487 F.Supp. at 1257.

After Federal threatened suit, Nottage met in London with Federal's officials in February 1978. He subsequently advised Underwriters to seek accommodation with Federal; buttressing his view was the opinion of Underwriters' American counsel that the policies could not be construed to support Underwriters' position. In March 1978 Nottage, Federal officials and counsel, and counsel for Underwriters met and negotiated a compromise agreement, executed March 13 (the March 13 Agreement). Its terms, as summarized by the District Judge, were as follows:

Underwriters agreed that after a claim had been filed and Underwriters had determined that the claim appeared to be valid and that Federal Leasing was complying with the due diligence clause, Underwriters would promptly advance to the investor sufficient funds to satisfy Federal Leasing's obligations. In return, Federal Leasing agreed to pay Underwriters all proceeds it collected as a result of the remarketing of the computer equipment involved in a cancellation but not more than the amount of the loss paid by Underwriters. In addition, Underwriters agreed that seventeen outstanding claims were in fact valid, and Underwriters agreed to pay those claims.

487 F.Supp. at 1258.

This accord, effective April 1, 1978, was approved by all the underwriting syndicates which had taken portions of the risks covered by the policies. Underwriters on April 6, 1978 paid $1,581,774.16 owing on the seventeen claims and, from March 1978 to January 1979, the sum of $7,095,143.83 on eighteen more claims.

In February 1979 Underwriters ceased payments under the March 13 Agreement. Their reason, found the District Judge, was not "the discovery of any previously unknown facts which would amount to a proper defense to the claims," but merely the large number of claims then being filed. *Id.* The next month Underwriters appointed First National Bank of Boston as claims adjuster and declared a moratorium on further payments; they did pay three claims in March and April, however, totalling $866,149.31.

Then came the crisis for Federal:

Caught between the investors' pressing demands for payment of their legitimate claims and Underwriters' refusal to pay for these losses under the insurance policies and the March 13 Agreement, Federal Leasing filed this pending action on June 12, 1979. Since this action was filed, a few claims have been paid by Underwriters. In June 1979, a claim in the amount of $1,789,412.19 was paid. On December 10, 1979, this Court approved the settlement of the claims of Barnett Leasing Company in the amount of approximately $1,765,000. No other claims by Federal Leasing have been paid or settled.

Federal Leasing's predicament has become more acute as a result of litigation in other courts against it. Several investors have sued Federal Leasing in other state or federal courts, and in one of these cases, a substantial judgment against Federal Leasing alone has been obtained by an investor. Sun Life Insurance Company of America, Union Central Life Insurance Company and Skokie

Trust & Savings Bank, assignees of certain claims of the Bank of California involved here, have a suit pending in the Superior Court of Baltimore City, seeking judgment against Federal Leasing and Underwriters in the amount of some $3,882,840. Oak Park Trust & Savings Bank has an action pending in the United States District Court for the Northern District of Illinois, seeking judgment in the amount of $243,525.

*Id.* (footnote omitted).

On September 20, 1979 Federal moved the District Court for a preliminary injunction ordering Underwriters to pay the insurance claims of Federal's investors. The Court assessed Federal's circumstances in the following grim terms:

As of March 31, 1979, Federal Leasing's net worth was $1,559,902. Underwriters are and have been well aware of the limited resources available to Federal Leasing for the payment of the large outstanding claims of the investors. The record establishes that if all the claims against Federal Leasing as to which this Court does not have jurisdiction were reduced to judgment, Federal Leasing would be rendered bankrupt.

*Id.* at 1259.

## II.

In this circuit the standard for interlocutory injunctive relief is the "balance-of-hardship" test. *Blackwelder Furniture Co.* *v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir. 1977).[4] This test requires a "flexible interplay" among four factors: the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; the likelihood of harm to the defendant if the requested relief is granted; the likelihood that plaintiff will succeed on the merits; and the public interest.

*Blackwelder* directs the District Court to consider first the likelihood of irreparable harm to the plaintiff, as balanced against the likelihood of harm to the defendant. *Id.* at 196. "If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." *Id.* Conversely, a weaker showing of the likelihood of irreparable injury will necessitate a stronger showing of probability of success; and if irreparable injury is merely "possible," probability of success may be decisive. *Id.* at 195, 196.

The District Court recognized that the award of a preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought. Noted, too, was that its *raison d'etre* is "to preserve the *status quo* during the course of a litigation in order to prevent irreparable injury to the moving party and in order to preserve the ability of the court to render complete relief." 487 F.Supp. at 1259. The Court's

**4.** *Accord, Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4th Cir. 1980).

The District Court determined that Federal rather than State standards should govern the availability of preliminary injunctions in diversity actions. We need not decide this question, as we conclude that the preliminary injunction issued in this case would be equally available under Maryland law.

*State Dep't of Health & Mental Hygiene v. Baltimore County*, 281 Md. 548, 383 A.2d 51 (1977), outlines a four-factor test similar to that prescribed by *Blackwelder*: "It is frequently said that a proper exercise of discretion requires the court to consider four factors: likelihood of success on the merits; the 'balance of convenience'; irreparable injury, which can include the necessity to maintain the status quo; and, where appropriate, the public interest." *Id.* at 554, 383 A.2d at 55. We are aware of no

Maryland case that would apply these factors so strictly as to require denial of Federal's motion. Underwriters rely on *Perlmutter v. Minskoff*, 196 Md. 99, 75 A.2d 129 (1950), in which the Maryland Court of Appeals upheld the denial of an injunction for payment of "money due under contracts," and held injunctive relief inappropriate for the mere accelerated collection of such debts. *Id.* at 110–111, 75 A.2d at 134. In that case, however, the Court found that no adequate showing had been made of fraud, irreparable harm, or other basis for equitable relief; indeed, the Court concluded that under the movant's own allegations the claimed payments were not yet due. The District Court's findings in the present case, as to both the nature and strength of Federal's claims, are in marked contrast to those in *Perlmutter*.

exercise of discretion was marked by careful adherence to the principles delineated by the authorities just referenced.

### a. *Balance of hardship.*

After a painstaking canvass of a complex and voluminous record, the District Court concluded that Federal probably would suffer irreparable injury if the preliminary injunction were denied. Contrary to Underwriters' assertion, Federal does not seek, and has not received, the mere acceleration of a money debt otherwise compensable in damages. It seeks to preserve its existence and its business. In a somewhat analogous situation—a disputed franchise termination in which the record included hotly disputed allegations of fraud—Judge Friendly commented: "[T]he right to continue a business . . . is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award." *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970). Even if Federal were to survive, the continuation of its present predicament endangers its relations with customers and investors, the good will built up by a heretofore successful enterprise; such damage is "incalculable—not incalculably great or small, just incalculable." *Blackwelder,* 550 F.2d at 197.

The Court balanced the probability of the harm to Federal against the probability of harm to Underwriters, and concluded that the relief was warranted. We cannot say that this was error: the risk of harm to Underwriters is largely foreclosed by permitting them to demand of any investor-claimant an adequate refunding surety bond, and by allowing them interest on any moneys paid out should Underwriters ultimately prevail. The parties' "*relative quantum and quality of* . . . likely harm," *Blackwelder,* 550 F.2d at 196, that is, the balance of hardship, appears in these circumstances to tip decisively in Federal's favor.

### b. *Probability of success.*

The Court found Federal's likelihood of ultimate success to be very high. While the "clearly erroneous" standard may be less appropriate when findings are entered, as here, on conflicting affidavits and depositions, the Court's close evaluation of this question merits considerable deference.

Underwriters allege numerous instances of misrepresentation and fraud which, they contend, provide a complete defense to Federal's claims. As we see these contentions to be altogether frail, we note them only to say that the District Court reviewed them *in extenso* and, far from contradicting itself as asserted by Underwriters, outlined several alternative theories under which it considered Federal likely to succeed. We need not agree with each of the Court's provisional findings in order to affirm its overall assessment of Federal's chances at trial. There is no error in the Court's conclusion.

### III.

The payment of money was not the only obligation undertaken by the parties in the March 13 Agreement. Faced with Underwriters' surprising and untenable interpretation of the insurance policies, Federal sought to resolve the dispute and to institute procedures by which future insecurity could be avoided. To achieve these ends it gave valuable consideration. The Court acted to maintain the integrity of the compact. Any idea of imposture upon Underwriters is dispelled upon reading and weighing the Court's outline of the order it envisioned:

> The preliminary injunction to be entered by the Court will not directly order Underwriters to pay any of the claims involved in this litigation. The injunction will require Underwriters to comply with the provisions of the March 13 Agreement and to process claims for payment in the same manner as it did after April 1, 1978. In so complying, Underwriters should certainly pay some of the claims without delay.
>
> On the other hand, the processing in good faith of certain other claims may disclose that they should not be paid. For example, . . . Underwriters contend

that some transactions were declared before the user agreement was executed. Such an occurrence would be a violation of terms of the Master Policies. Further investigation of the facts is necessary before a decision can be made by Underwriters concerning claims of this sort.

· If sound reasons exist for declining to pay a claim, Underwriters would not be required to make the payment in question. Explicit reasons should be given by Underwriters for the non-payment of a claim. However, it would be a violation of the March 13 Agreement and of the preliminary injunction if the reasons advanced by Underwriters are clearly without foundation or designed for purposes of delay. Performance by Underwriters under the injunction should be measured by their performance of the March 13 Agreement between April 1, 1978 and February 1979. During that period, Underwriters complied with the terms of the Agreement, paying most of the claims presented and declining to pay invalid claims. The injunction to be entered herein will compel Underwriters to continue to perform in that manner during the pendency of this litigation.

487 F.Supp. at 1267 (footnote omitted). The Court prohibited Underwriters from refusing any claim in reliance on defenses already considered and rejected by it. *Id.* at n. 21. Of course, Underwriters still may press such defenses at trial, but the record clearly supports the District Court's conclusion that their assertion in this context would not constitute "processing in good faith." The preliminary injunction actually issued by the Court faithfully reproduces the features herein outlined. There is no abuse of discretion in its form and scope.

As we appraise the facts found by the trial judge and analyze the precedents and treatises cited by him, we think that in the climacteric circumstances the injunction was clearly demandable and warrantably awarded.

Affirmed.